INDUSTRIAL ACOUSTICS COMPANY, S.C., INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

INDUSTRIAL ACOUSTICS COMPANY, S.C., INCORPORATED, Respondent,

v.

NATIONAL LABOR RELATIONS BOARD, Petitioner.

Nos. 89–2216, 90–2019.

United States Court of Appeals, Fourth Circuit.

Argued July 19, 1990.

Decided Aug. 30, 1990.

---

Stephen X. Munger, Jackson, Lewis, Schnitzler & Krupman, Atlanta, Ga., argued (Christopher C. Antone, Jackson, Lewis, Schnitzler & Krupman, Atlanta, Ga., Paul B. Lindemann, Jackson, Lewis, Schnitzler & Krupman, Greenville, S.C., on brief), for petitioner.

David A. Seid, N.L.R.B., Washington, D.C., argued (Jerry M. Hunter, Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Aileen A. Armstrong, Deputy Gen. Associate Gen. Counsel, Peter Winkler, Supervisory Atty., N.L.R.B., Washington, D.C., on brief), for respondent.

Before RUSSELL, WIDENER and HALL, Circuit Judges.

K.K. HALL, Circuit Judge:

Industrial Acoustics Company, S.C., Inc. ("Industrial") petitions for review of a National Labor Relations Board ("Board") order requiring it to collectively bargain with the Sheet Metal Workers International Association, Local Union 399, AFL–CIO, CLC ("Union"). The Board has filed a cross-application for enforcement of its order. Finding that the Board abused its discretion in certifying the Union as the exclusive bargaining representative of Industrial's employees, Industrial's prayer for relief is granted and the Board's cross-application for enforcement is denied.

## I.

Industrial manufactures commercial acoustic soundproofing material at a plant in Moncks Corner, South Carolina. On December 20, 1987, the Union filed a petition with the Board seeking certification as the exclusive bargaining representative of Industrial's production and maintenance employees. Industrial and the Union entered into a stipulated election agreement and the election was set for 2:00 p.m. on February 18, 1988.

As the election approached, the main issue became the wages and benefits received by the non-union Moncks Corner employees versus those received by the unionized employees at Industrial's plant in the Bronx, New York. The Union and Industrial made widely divergent representations about the extent of any difference between the two plants and the election rhetoric became quite heated. In particular, the Union repeatedly made disparaging remarks about Industrial's main spokesman, Fred Oran.[1]

On the day before the election and on election day, the Union parked a car, mounted with a loudspeaker system, 25–30 yards from the Industrial plant main entrance. On both days, the Union broadcast music and campaign messages (focusing on the wage and benefits issue and on Oran) from approximately 6:50 a.m. to 7:05 a.m., and just before 12:00 noon to 12:35 p.m. Also, on February 17, the Union broadcast from 3:25 p.m. to 3:40 p.m. and just before and after 5:30 p.m. These broadcasts were intentionally timed to coincide with the beginning and ending of the day shift (7:00 a.m.–3:30 p.m.) and with lunch breaks (12:00–12:30 p.m.) at the plant. The February 17, 5:30 p.m. broadcast coincided with the end of an overtime day shift.

The loudspeaker system had a range of well over one hundred yards and the Union's messages were clearly heard on the plant grounds. Because of industrial noise, however, the broadcasts were inaudible inside plant buildings when machinery

---

1. Oran was called names like "Fast Freddy" and "Pinocchio nose" and was accused of lying, stealing, and marital infidelity.

was in use.[2] However, at the lunch break, when no machinery is in use, and when employees were outside the plant buildings, the broadcasts were more easily heard. Employees were not free to leave the plant area during their lunch break.

The election was held as scheduled, and the Union won by an 81 to 71 vote. Industrial filed election objections, including one over the Union soundcar broadcasts. The company contended that the broadcasts violated the longstanding rule of *Peerless Plywood Co.*, 107 NLRB 427 (1953), which prohibits speeches by either the union or the employer to massed assemblies of employees, on company time, within 24 hours of an election. The regional director issued a report sustaining the soundcar objection and directing a second election. The Union filed exceptions, and on July 5, 1988, the Board reversed the regional director and ordered a hearing.

In early August, a four-day hearing was held which featured several employee witnesses, both for Industrial and for the Union, who testified about the existence of the Union broadcasts and the extent to which they could be heard inside the plant buildings. On November 30, 1988, the Hearing Officer issued a report rejecting Industrial's soundcar objection and recommending that a Certification of Representation be issued. The Hearing Officer discounted the testimony of several witnesses who stated that they heard portions of the broadcasts during working hours or while on lunch break because the witnesses "were unsure of the times that the broadcasts began and ended; either did not listen; could not hear them, or did not pay attention to what was said." The Officer concluded "that based upon the limited duration of the broadcasts during actual working time; the severely limited ability of employees working to hear the broadcasts due to the noise level, together with the inconsistent statements of the Employer witnesses as to what was actually heard, the evidence is insufficient to establish that

the Board's *Peerless Plywood* rule was violated."

On December 20, 1988, Industrial filed exceptions to the Hearing Officer's report. On March 8, 1989, the Board adopted the Hearing Officer's findings and recommendations, and certified the Union.

On March 17, 1989, the Union requested Industrial to bargain. Industrial refused. On April 11, 1989, the Union filed an unfair labor practice charge under § 8(a)(1), (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (5). Industrial answered the charge, admitting its refusal to bargain but contending that the Union had been improperly certified. The General Counsel moved for summary judgment against Industrial. On November 21, 1989, the Board granted the motion, in effect affirming its previous ruling that the soundcar broadcasts did not violate the *Peerless Plywood* rule. Industrial was ordered to bargain with the Union. This petition for review and cross-application for enforcement followed.

## II.

Industrial argues that the Board abused its discretion in certifying the Union as its employees' exclusive bargaining representative. Industrial acknowledges the difficult burden it carries in seeking to overturn a certified election, but nonetheless contends that the election should be set aside because the Board has simply failed to follow its longstanding *Peerless Plywood* precedent. We agree.

■ The conduct and certification of representation elections constitute an area of labor relations uniquely within the Board's expertise. *NLRB v. Hydrotherm, Inc.*, 824 F.2d 332, 334 (4th Cir.1987). Consequently, we are reluctant indeed to upset a decision that an election represents the free choice of the employees in an appropriate bargaining unit. We will do so only on a showing of an abuse of discretion. *Id.*, citing *NLRB v. Manufacturer's Packaging work.*

---

**2.** In fact, the noise level inside the buildings is such that some employees wear ear plugs dur-

*ing Co.*, 645 F.2d 223, 225 (4th Cir.1981). We find the Board's misapplication of the *Peerless Plywood* rule to the facts at hand, however, to be just such an abuse.

In *Peerless Plywood*, the Board wrestled with the vexing problem of the "unsettling" effect on free and fair elections caused by "last-minute speeches by either employers or unions delivered to massed assemblies of employees on company time." *Id.* at 429. Prior to *Peerless Plywood*, the Board dealt with an employer who made such a speech by forcing him to grant the union an opportunity to reply. This approach proved inadequate because it gave an "unfair advantage to the party, whether employer or union, who in this manner obtains the last most telling word." *Id.* ˙ Consequently, the Board decided to craft a prohibition of all such speeches.

> This rule shall be that employers and unions alike will be prohibited from making election speeches on company time to massed assemblies of employees within 24 hours before the scheduled time for conducting an election. Violation of this rule will cause the election to be set aside whenever valid objections are filed.

*Id.* However, this bright-line rule does not prohibit campaign speeches within the 24–hour period so long as employee attendance is voluntary and the speeches are made on the employees' own time. *Id.* at 430. Subsequent cases in which the Board has applied this rule demonstrate that it has done so with vigilance.

While *Peerless Plywood* arose out of a situation where the employer had assembled his employees to give them a speech, the rule was soon applied to soundcar broadcasts. In *Underwood Corp.*, 108 NLRB 1368 (1954), the Board found the rule not to be violated by union soundcar broadcasts which occurred during the employees' lunch hour, when the employees were on their own time. In *U.S. Gypsum Co.*, 115 NLRB 734 (1956), the Board set aside an election when an all-day soundcar broadcast reached employees as they

worked. Although recognizing that the employees were not in a "mass assembly" as that term is commonly understood, the Board found that the rule applied where "the employees who heard or could have heard the speeches were not isolated, but were working with or near each other." *Id.* at 735.

The Board has also determined that, regardless of their actual effect, the pernicious nature of *Peerless Plywood* speeches is such that an election tainted by them must be set aside. In *U.S. Gypsum*, the election was set aside even though the speeches could be heard by only a fraction (50 of 424) of U.S. Gypsum's voting employees. Likewise, in *Great Atlantic & Pacific Tea Co.*, 111 NLRB 623 (1955), an election was set aside because of an employer's election day speeches to some 60 to 80 employees out of 6,373 eligible voters. There the employer argued for a *de minimis* exception to the rule. In flatly rejecting such an exception, the Board declared:

> Violation of the *Peerless Plywood* rule, as in the case of improper electioneering, constitutes ground for setting aside an election, entirely apart from the considerations which accompany findings of specific interferences with an election. It is sufficient that *Peerless Plywood* speeches tend to prevent a free election; the actual effect upon the voters in any case—even if it could be measured—is not material. Nor is it necessary that such conduct affect enough employees to change the election result.

*Id.* at 625–26; *Honeywell, Inc.*, 162 NLRB 323, 326 (1966) ("strict adherence" to rule is desirable to promote fair elections).[3]

Through *Peerless Plywood* and its progeny, the Board has shaped a broad prohibition of these pre-election speeches. The Board has failed to follow this prophylactic rule in the instant case.

■ In holding that *Peerless Plywood* did not apply, the Hearing Officer relied on three factors: (1) the limited duration of the broadcasts; (2) the severely limited ability of the working employees to hear

---

**3.** Of course, a party cannot violate *Peerless Plywood* in an attempt to sabotage an election that the party is certain to otherwise lose. The labor law will not allow one to profit by its own illegal acts. *See Packerland Packing Co.*, 185 NLRB 653, 654 (1970).

the broadcasts; and (3) the employees' failure to pay attention to, and later recall, the content of the speeches. As the above discussion demonstrates, none of these reasons is sufficient to remove the Union's broadcasts from the ambit of *Peerless Plywood*.

The rule is clear in its absolute prohibition of campaign speeches made within 24 hours of an election, on company time, to massed assemblies of workers. Here, the evidence is uncontradicted that the afternoon broadcasts of February 17, and the morning and lunch-time broadcasts of February 18, were within 24 hours of the election and overlapped significantly onto company time. And, because the employees were not free to leave the company premises during the lunch break, the entirety of the lunch time broadcast contravened the rule.[4] To find these speeches outside the rule based on their limited duration would be completely contrary to the Board's admonition in *Great Atlantic & Pacific Tea Co.*, that a *de minimis* exception to *Peerless Plywood* is not appropriate. *Id.* at 625–26. As the Board stated in *Rodac Corp.*, 231 NLRB 261 (1977), where it set aside an election because of an employer's speech which ran over into the 24–hour period by 7 minutes, "in cases involving deliberate disregard of the 24–hour limitation, strict enforcement is required if the *Peerless Plywood* rule is to survive irreparable erosion."[5] Further, although the evidence shows that the speeches were inaudible inside plant buildings while the machinery was in use, the evidence also shows that the speeches were much more easily heard by the employees during their lunch break, and when they were outside plant buildings. Lastly, the fact that some employees cannot recall the content of the speeches, or did not pay attention to them in the first instance, is simply immaterial to whether a *Peerless Plywood* violation has occurred. As *Great Atlantic & Pacific Tea Co.* makes clear, the actual effect the speeches had on the voters makes no difference. *See NLRB v. DIT–MCO, Inc.*, 428 F.2d 775, 778 (8th Cir.1970) ("showing that . . . electioneering proved ineffective constitutes a legally irrelevant matter of fact").

Here the Board had done exactly what it has cautioned in the past must not be done:

The essential position of the Employer . . . is that the Board, in each case, should measure the effect of *Peerless Plywood* violations to determine the degree of influence upon the eligible employees in the unit as a whole. This view, in our opinion, ignores both the purpose and the concept underlying the *Peerless Plywood* rule, which is to provide a preliminary condition and safeguard so that the election may be held in an immediate atmosphere conducive to a free expression by the employees. . . . Such a test does not comport with the concept of a Board electioneering rule; and it would, in our judgment, severely adulterate the *Peerless Plywood* rule, as it has heretofore been defined and applied. We see no middle ground.

*Great Atlantic & Pacific Tea Co.*, 111 NLRB at 625–26. We have no difficulty finding that the Union's soundcar broadcasts violated this safeguard to free elections. The Board's argument to the contrary is unpersuasive.

In support of its position, the Board relies heavily on its decision in *Crown Paper Board Co.*, 158 NLRB 440 (1966). There, it rejected a *Peerless Plywood* challenge to a union soundcar broadcast which was timed,

---

**4.** The Board argues that its holding in *Underwood* that a violation of the rule does not arise from lunchtime speeches demands the contrary conclusion. We disagree. There was no finding in *Underwood*, as there is here, that the employees were not free to leave and thus were a captive audience. Under these circumstances, their attendance of these speeches was in no sense of the word, voluntary. *See Homer Politte d/b/a H & P Mining Co.*, 114 NLRB 1436 (1955) (speech on employees' time where attendance was mandatory violates rule); *NLRB v. Hudson Oxygen Therapy Sales Co.*, 764 F.2d 729, 732 (9th Cir.1985) (rule prohibits speeches to "captive" audiences).

**5.** The Board has, however, balked at applying the rule to speeches which inadvertently run over into the 24–hour period. *See Granite State Veneer, Inc.*, 123 NLRB 1497, 1498 (1959); *Nebraska Consolidated Mills, Inc.*, 165 NLRB 639, 640 (1967). Here the speeches were intentionally extended into working hours and the captive lunch break. Thus, this narrow exception to the rule is inapplicable.

as were most of the broadcasts in this case, to coincide with a shift change. In upholding the election, the Board, as the Hearing Officer did here, stated that one of its considerations was the limited duration of the broadcast. *Id.* at 443. Notwithstanding the Board's arguments, however, this was not the controlling factor in the case.

The broadcast in *Crown Paper* was different in kind from the broadcasts in this case. That broadcast consisted only of music and appeals to vote and the Board held that it was not an "election speech" within the meaning of *Peerless Plywood. Id.* at 443. Here, on the other hand, the Union's broadcasts of heated campaign rhetoric epitomize the type of emotional "election speech" *Peerless Plywood* is intended to circumscribe. Furthermore, the soundcar in *Crown Paper* had a range of only 25 yards, insufficient to reach the bulk of the company grounds. Here, the soundcar's slogans could be heard throughout the plant grounds. Finally, in *Crown Paper*, the Board found that the limited range of the soundcar, coupled with the timing of the broadcast, showed that the union only intended to reach employees on their own time, going to or from work. Here, no such finding is possible. The Union's lunch-time broadcast, coupled with the soundcar's extended range, make clear the Union's intentions to reach a captive employee audience.

The present case is easily distinguished from *Crown Paper* and falls squarely within the *Peerless Plywood* rule. While the Board is, of course, always free to abandon the *Peerless Plywood* rule, it did not do so here. Instead, it improperly applied the rule to the facts at hand. This failure by the Board to follow its own election rule constitutes an abuse of discretion.

### III.

For the foregoing reasons, Industrial's prayer for relief is granted and the Board's cross-application for enforcement is denied.

ENFORCEMENT DENIED.